

*Ilana Haramati*
*Partner*
Direct (646) 860-3130
Fax (212) 655-3535
ih@msf-law.com

April 9, 2024

**UNDER SEAL**

Honorable Michael A. Shipp
District of New Jersey
402 E. State Street
Courtroom 5W
Trenton, NJ 08608

Re:     *United States v. Eliyahu Weinstein*, 24-CR-128 (MAS)

Dear Judge Shipp,

    We represent defendant Eliyahu Weinstein in the above-referenced case. We write in opposition to the government prosecution team's motion requesting that the Court vitiate Mr. Weinstein's claims of privilege with attorney Shlomo Erez. The government asks for this drastic intervention based on the thinnest of records, and before any of the typical "filter" procedures have been completed—or even truly begun. The motion is both inappropriate, and premature.

    To protect claims of attorney-client privilege from improper intrusion, this District, like courts throughout the country, ordinarily employs a government "filter team" to negotiate and review presumptively privileged documents. Generally, once presumptively privileged communications are identified, the filter team produces those documents to the defendant who, as the client, holds the privilege. The defense team then reviews the documents and asserts any privilege in the form of a privilege log. Thereafter, any disagreements between the government's filter team and the defendant regarding the privilege are litigated, frequently resulting in the Court's *in camera* review of the presumptively privileged documents.

    The government does not want to bother with that. The government's filter team has not produced a single communication for Mr. Weinstein's privilege review. Instead, although amply supported by the very exhibits attached to the government's motion, the government simply denigrates Mr. Weinstein's credible claims of privilege as "baseless," and seeks to summarily do away with his attorney-client privilege protections. That is improper. The Court should deny the government's motion, and instead order the government to immediately produce to Mr. Weinstein all of his presumptively privileged communications with Erez for review in conjunction with the government's filter team, in accordance with accepted protocol.

    Nor can the government just disregard Mr. Weinstein's privilege because Erez is an alleged co-conspirator in some of the Indictment's accusations. Still, that is exactly what the government asks this Court to do. To pierce the privilege based on the "crime-fraud exception," the law clearly requires a particular review of each communication to determine whether it was "in furtherance"

of an alleged crime or fraud.  The government's prosecution team, however, believes that its investigation is more important than Mr. Weinstein's legal protections.  To the contrary.  For defendants like Mr. Weinstein whose very liberty is at stake, scrupulous attention to attorney-client privilege protections is of heightened significance.  Fortunately for Mr. Weinstein, the law is less cavalier about his rights than the government's prosecution team.  The Court should deny the government's request to void Mr. Weinstein's privilege claims based on the crime-fraud exception as well.

I.     **FACTUAL BACKGROUND: MR. WEINSTEIN HAS RAISED A CREDIBLE CLAIM OF ATTORNEY-CLIENT PRIVILEGE**

As detailed in Mr. Weinstein's attached affidavit, he engaged Shlomo Erez in an attorney-client relationship.  Mr. Weinstein first met Erez in his capacity as a lawyer.  And when Mr. Weinstein engaged Erez, he paid Erez a monthly retainer for legal services.  During their attorney-client relationship, Erez provided legal advice and diligence on transactions, as well as negotiated and drafted contractual documents—core legal services.  *See* Ex. 1  ¶¶ 3-8.

The government itself concedes that its "investigation revealed that various members of the conspiracy, including Erez himself, sometimes held Erez out to be an attorney for Weinstein and Optimus to third parties.  And some third parties believed Erez was acting as an attorney for Weinstein or Optimus."  Gov. Mot. at 7; *see also id.* at 7 n.1 (detailing examples of instances when Erez was represented as counsel for Optimus or Mr. Weinstein).

The government's own exhibits similarly support Mr. Weinstein's understanding that Erez acted in his capacity as a lawyer.  For example:

- Government Exhibit A attaches a letter written on Erez's law firm letterhead.

- Government Exhibit B includes email correspondence from Erez's law firm email, and references to Erez as "our lawyer."

- Government Exhibit C is a WhatsApp chat thread in which Erez is references as "Shlomo Erez Israeli Attorney."  In this WhatsApp chat, Erez addressed legal terms discussed in a loan agreement, addressed his "advice" regarding the transaction, and agreed to negotiate the contract further.  *See* Gov. Ex. C at 5 ("[3/16/23, 8:19:03 AM] Shlomo Erez Isr[ae]li A[t]torney: From initial review the Doc It is loan agreement not back up from Optimus to Tryon to cover debt Will send you all My thoughts next week. [3/16/23, 8:22:48 AM] Shlomo Erez Isr[ae]li A[t]torney: I will ask a letter from Saniton to me that incase the valuation of the company in the next 2 years will be X they will cover Optimus with the funds to be agreed by Optimus and Tryon[.] If Elie and Ari would agree to take your word on it they can do so yet it will be against my advice and it is fine by me").

- In Government Exhibit C, Erez also references his legal ethics precluding him from directly discussing legal matters with represented parting, asking other parties to

"confirm you are not engaged with an attorney [s]o that I can discuss with you directly." *See* Gov. Ex. C at 5 ("[3/20/23, 2:03:41 AM] Shlomo Erez Isr[ae]li A[t]torney: I need you and Chris to confirm you are not engaged with Attorney So that I can discuss With you guys directly. Chris did mention on our Thursday conversation. With respect to the Doc It is on will send you draft in few days").

- In Government Exhibit C, Erez also appears to circulate legal documents he drafted. *See* Ex. C at 6 ("[3/31/23, 10:06:49 AM] Shlomo Erez Isr[ae]li A[t]torney: Comfort Letter - Optimus to Tryon Mngmt 4872-1032-9690 v.1 - SSRGA Draft 3.30.23.docx • 2 pages <attached: 00000207-Comfort Letter - Optimus to Tryon Mngmt 4872-1032-9690 v.1 - SSRGA Draft 3.30.23.docx>; [3/31/23, 10:07:40 AM] Shlomo Erez Isr[ae]li A[t]torney: Gentleman this is draft.  Comments or suggestions will be welcomed").

- Government Exhibit D is a WhatsApp chat thread in which Erez circulates a draft contract, and discussed his contractual negotiations.  *See* Gov. Ex. D at 3 ("[9/13/22, 7:42:49 AM] Shlomo Erez: I have the draft waiting Ari to Look at it and send it to you"); *id.* (addressing contractual negotiations, stating " [9/13/22, 8:45:49 AM] Shlomo Erez: Draft: Richard Here are the consents / understandings as to my meeting with Chris on Brussels last Monday. . ." and detailing negotiation terms).

- In Government Exhibit D, Erez also appears to prepare and circulate a draft non-disclosure agreement.  *See* Gov. Ex. D at 19 ("[11/1/22, 11:52:12 AM] Shlomo Erez: Mutual NDA template.doc ‎<attached: 00000757-MutualNDA template.doc>").

The limited set of non-privileged communications that the government has produced to Mr. Weinstein to date are similarly replete with support for Mr. Weinstein's understanding that Shlomo Erez was his attorney.  Indeed, Mr. Weinstein expressly told government cooperators "Shlomo's my lawyer."  *See* Ex. 2 (excerpts of consensual August 29, 2022 recording draft transcripts reflecting the following conversations: "Eli: I'm sending Shlomo straight over to Musa. Shlomo's my lawyer- he knows Musa. He was there when the whole thing happened."; "Richard: Hey also the documents on all of the properties that we're talking about you'll be able to send that to us, right? Eli: Where do you want it assigned to, guys? Richard: We'll decide that. Eli: I think you should leave it with **Shlomo with an assignment by lawyer**. . . .") (emphasis added).

While the government disparages Mr. Weinstein's privilege assertions as "baseless," Gov. Mot. at 10, the record is to the contrary.  Mr. Weinstein has raised a credible attorney-client privilege claim with respect to his relationship and communications with Shlomo Erez.

Hon. Michael A. Shipp
April 9, 2024
Page 4 of 12

---

**II.  PROCEDURAL POSTURE: MONTHS AFTER SEIZING DEVICES WITH MR. WEINSTEIN'S PRESUMPTIVELY PRIVILEGED COMMUNICATIONS, THE GOVERNMENT'S FILTER TEAM HAS YET TO PRODUCE A SINGLE SUCH COMMUNICATION FOR MR. WEINSTEIN'S REVIEW**

Other than the few communications provided by the government attached to its memorandum, and a handful of non-privileged recordings involving Erez and third parties produced in discovery thus far, Mr. Weinstein has received not received any of his private (and thus presumptively privileged) communications with Erez in production from the government. The government's filter team has thus far made no productions to Mr. Weinstein. He has no information regarding the content, timing, or volume of the presumptively privileged communications between Mr. Weinstein and Erez. Mr. Weinstein has requested that the government's filter team produce such communications. *See* Ex. 3.[1] Without the communications themselves, Mr. Weinstein remains unable to analyze the communications' privileged nature with any specificity, or otherwise provide the Court with any real detail regarding the privileged content of the communications.

The government complains that Mr. Weinstein's privilege assertions over his communications with Erez have caused delay as "law enforcement has been unable to review the communications on Erez's phone or even speak with Erez in detail about the conspiracies, clearly prejudicing the Government's prosecution." *See* Gov. Mot. at 10. That is not so.

Mr. Weinstein, Bromberg, and Erez were all arrested on July 19, 2024 on a criminal complaint in *United States v. Weinstein, et al.*, No. 23-mj-03038 (TJB). On that same date, the government seized the devices belonging to Bromberg and Erez. Some of those devices contain the communications that are the subject of the government's motion. On December 7, 2023, nearly five months after their initial seizure, the filter team first contacted Mr. Weinstein's defense team to address his assertions of attorney-client privilege. Since asserting Mr. Weinstein's privilege, Mr. Weinstein and counsel have received no substantive communications from the filter team regarding filter review protocol or filter search terms. Neither has Mr. Weinstein received a copy of his communications with Erez from the filter team as part of a privilege review.[2]

---

[1] Attached as Exhibit 3 is an April 5, 2024 letter that Mr. Weinstein's counsel sent to the government's filter team requesting production of presumptively privileged communications between Mr. Weinstein and Erez.

[2] That the presumptively privileged communications between Mr. Weinstein and Erez may have been seized from Erez's devices does not diminish Mr. Weinstein's right to review those communications and render privilege determinations. As the client, Mr. Weinstein is the privilege holder; Erez is not and cannot waive the privilege. *See Church of Universal Love & Music v. Fayette Cnty.*, No. CIV.A. 06-872, 2009 WL 159272, at *1 (W.D. Pa. Jan. 22, 2009) ("an attorney cannot waive his client's privilege") (citing *Rhone–Poulenc Rorer Inc. v. Home Indem. Co.*, 31 F.3d 851, 862 (3d Cir.1994)).

Of course, standard procedure in this District, as well as other federal district courts throughout the country, is that a filter team within the U.S. Attorney's Office, separate from the prosecution team, handles all aspects of privilege communications, review and litigation. *See In re Search of Electronic Comms.*, 802 F.3d 516, 530 (3d Cir. 2015) (a "filter team" is "common tool employed by the Government to protect privileges"). Typically, the government's filter team will request attorney information from the defense, negotiate filter terms to identify and separate potentially privileged documents, and establish a review protocol (often in consultation with the defense) for those potentially privileged documents. During that process, the filter team typically produces to the defense the universe of potentially privileged communications. This procedure is designed to both protect defendants' attorney-client privileged communications, and permit expeditious review of discovery materials. That is what the law requires. *See United States v. Vepuri*, 585 F. Supp. 3d 760, 764 (E.D. Pa. 2021) ("The filter team, walled-off from the prosecution team, may retain and review all materials seized. The Government **shall** provide the defendant with immediate access to the materials in its possession. The defendant shall review the materials as promptly as possible and advise the filter team which materials it considers to be privileged.") (emphasis added).

That is not what happened here, however. Instead, the government seeks to side-step the filter process in its entirety, attempting to vitiate Mr. Weinstein's claims of privilege with generalized allegations of fraud. Because of the attorney-client privilege's import, established case law requires more careful consideration of privilege claims. Any effort to pierce the privilege requires detailed fact-based review of the privilege claims, and a document-specific review of any claims that the privilege should be vitiated based on the crime-fraud exception. *See infra* § § III, IV. Without production of the universe of presumptively privileged documents to Mr. Weinstein, that well-established process cannot even begin.

### III. MR. WEINSTEIN AND EREZ MAINTAINED AN ATTORNEY-CLIENT RELATIONSHIP: THEIR COMMUNICATIONS ARE PRESUMPTIVELY PRIVILEGED

The government claims that no attorney-client relationship existed with Erez, and thus that private communications with him are not privileged because: (1) "Erez was a lawyer but that Erez played more of a transactional role;" (2) "Erez flatly rejected Weinstein's privilege claims. He denied, in no uncertain terms, ever having any attorney-client relationship with Weinstein or Optimus;"[3] and (3) Joel Wittels proffered to the government "that Erez was not acting as a lawyer and did not provide Optimus any legal advice." Gov. Mot. at 8-9. None of those arguments, however, can overcome Mr. Weinstein's claim of privilege. First, transactional counsel can, and

---

[3] Beyond the documentary record, and affidavit from Mr. Weinstein, there is further reason to doubt Erez's present denial of any attorney-client relationship with Mr. Weinstein or Optimus. Shortly after the arrests in this case in July 2023, Erez's prior counsel Charles Adams, represented to counsel for Mr. Weinstein that the discovery and litigation in the case would raise privilege issues respecting Erez's communications with Mr. Weinstein, which the parties should work through jointly.

frequently do, provide legal advice and services—the non-privileged evidence produced to date reflects that Erez did precisely that, drafting and commenting on contracts and other legal documents memorializing transactions' binding legal terms. Moreover, neither Erez nor his other presumptive clients, including Joel Wittels on behalf of Optimus, can waive Mr. Weinstein's privileged relationship with his counsel. Instead, to the extent there is a question regarding the existence of a valid attorney-client relationship, that is a question of fact for the Court, requiring additional evidence, including potentially witness testimony, including by Erez.

> A. **An Attorney-Client Privilege Existed Between Mr. Weinstein and Erez: As the Privilege Holder Only Mr. Weinstein Can Waive that Privilege**

The attorney-client privilege is the oldest and most venerated privilege under our common law. "The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance." *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007). "Its purpose is to encourage attorneys and their clients to communicate fully and frankly and thereby to promote 'broader public interests in the observance of law and administration of justice.'" *Id.* (quoting *Upjohn v. United States*, 449 U.S. 383, 389 (1981)). "The availability of sound legal advice inures to the benefit not only of the client who wishes to know his options and responsibilities in given circumstances, but also of the public which is entitled to compliance with the ever growing and increasingly complex body of public law." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1036–37 (2d Cir. 1984).

"[T]he attorney client privilege is one that is owned by the client," and Mr. Weinstein is unequivocal that he and Erez had a privileged attorney-client relationship. *In re Grand Jury Subpoena*, 223 F.3d 213, 215 (3d Cir. 2000).[4] Mr. Weinstein retained Erez to act as is counsel. Mr. Weinstein was first introduced to Erez as an attorney, got to know him in Erez's capacity as counsel, and paid Erez a monthly retainer for his legal services. Ex. 1 ¶¶ 1-3. The limited set of

---

[4] That Erez was at all times an attorney licensed in Israel, not the United States is not dispositive. Courts have recognized privilege protections for foreign counsel. *See, e.g., Fraunhofer-Gesellschaft Zur Forderung Der Angewandten Forschung e.V. v. Sirus XM Radio Inc.*, No. CV 17-184-JFB-SRF, 2022 WL 20806272, at *2 (D. Del. June 28, 2022) (extending privilege to communications with German qualified "in-house patent attorney" who "was authorized to provide legal advice" in his home country); *Keating v. McCahill*, No. CIV.A. 11-518, 2012 WL 2527024, at *3 (E.D. Pa. July 2, 2012) ("The Pennsylvania rule that the lawyer must be 'a member of the bar of a court . . . does not limit the privilege to members of the Pennsylvania bar. Rather, 'the privilege applies to communications to a person whom the client reasonably believes to be a lawyer. Thus, a lawyer admitted to practice in another jurisdiction or a lawyer admitted to practice in a foreign nation is a lawyer for the purposes of the privilege.'") (quoting Rest.3d Law Governing Lawyers § 72 (comment (e)).

non-privileged communications involving Erez that the prosecution team attached to its brief,[5] only support Mr. Weinstein's understanding that Erez was his lawyer. *See* Gov. Ex. C at 5-6; Gov. Ex. D at 3, 19 (Erez repeatedly engages in contractual review, advice and drafting, including circulating and commenting on draft contracts and contractual terms).

Because Mr. Weinstein is the owner of the privilege with Erez, only he can waive that privilege. To the extent Erez jointly represented Mr. Weinstein and Optimus, neither Joel Wittels nor any other joint client can waive the privilege on Mr. Weinstein's behalf. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 363 (3d Cir. 2007) ("waiving the joint-client privilege requires the consent of all joint clients."). The government's proffer that Erez disavowed any attorney-client privileged similarly should not govern the Court's analysis. Because Erez, as counsel does not own the privilege, he cannot waive it. *See Church of Universal Love & Music*, No. CIV.A. 06-872, 2009 WL 159272, at *1. The government cites no law supporting, or even suggesting otherwise. What Erez may now be telling the government in the context of his cooperation regarding his relationship with Mr. Weinstein thus carries little weight.

Nonetheless, because the existence of an attorney-client relationship is an issue of fact for the Court's determination, to the extent the court has any lingering questions regarding the nature of Mr. Weinstein's relationship with Erez, the Court should hold a fact-finding hearing with witness testimony. *See, e.g., Montgomery Cnty. v. MicroVote Corp.*, 175 F.3d 296, 299 (3d Cir. 1999) (district court held a hearing with witness testimony "to determine if [certain documents prepared by an attorney] w[ere] privileged).

**B.   Erez Acted As Transactional Counsel: Third Circuit Precedent Protects Such Attorney-Client Relationships as Privileged**

The government argues that Erez could not have had an attorney-client relationship with Mr. Weinstein because he played a role in business transactions. *See, e.g.,* Gov. Mot. at 7 (Erez "acted solely as an investor and business consultant"), 8 ("Erez acted in a business capacity, not as an attorney"). Not so. Third Circuit case law is clear that counsel's role in providing legal advice and services regarding business transactions is squarely protected by the attorney-client privilege. *See Montgomery Cnty.*, 175 F.3d at 298 ("Our review of the record, however, compels us to conclude that Shamos, who was retained through his law firm and participated in contract

---

[5] Of course, although involving a lawyer, these communications with Erez are not privileged because they were not private. Instead, they included third parties outside the privilege. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) ("The attorney-client privilege protects communications between attorneys and clients from compelled disclosure. It applies to any communication that satisfies [several] elements," including that the communications were made "in confidence.") (quotation marks and citations omitted).

negotiations, acted as the County's attorney and, thus, the attorney-client privilege precludes discovery of five of the documents.") (cited by Gov. Mot. at 11).[6]

The Third Circuit's decision in *Montgomery County v. MicroVote Corp.*, analyzed same the question before the Court: whether the privilege attaches to communications with an attorney hired to "consult" on certain transactions. *See id.* at 301 ("We now confront the central issue on this appeal: whether the attorney-client privilege precludes the discovery of the [attorney] Shamos documents. [The defendant] argues that the documents are not privileged because at all times [attorney] Shamos performed services for the County, he acted as a consultant and not as legal counsel."). In *Montgomery County*, the Third Circuit found that the communications at issue were protected by the privilege because the client "sought" and the attorney "performed, legal services, including negotiating a contract and rendering advice," as well as attending meetings with third parties regarding contract negotiations, and rendering advice related to the transaction. *Id.* at 303. The Third Circuit also considered that the attorney was retained and paid through his law firm, as further evidence that the attorney "acted as the County's attorney and, thus, the attorney-client privilege precludes discovery of five of the documents." *Id.* at 298.

*Montgomery County's* analysis holds equal force here. As reflected in the small subset of non-privileged documents attached to the government's motion, Erez provided precisely the types of transactional legal services—contract negotiations, contract drafting, attending meetings, correspondence, and advice—contemplated under Third Circuit privilege case law. *See* Gov. Ex. C at 5 (Erez reviewing contract and promising to send "all [m]y thoughts next week"); Gov. Ex. C at 6 (Erez circulating draft contract); Gov. Ex. D at 3 (same); Gov. Ex. D at 19 (same). Indeed, correspondence from Erez was sent on his law firm letterhead or official email. *See* Gov. Ex. A; Gov. Ex. B. And, Mr. Weinstein specifically sought out Erez, retained him, and paid him as counsel. *See* Ex. 1 ¶¶ 1-3. As in *Montgomery County*, there is clear evidence of an attorney-client relationship. *Compare* Ex. 1 ¶¶ 1-8 *with Montgomery Cnty.*, 175 F.3d at 303.

The government's proffer that some of its cooperators disavowed Erez's role as counsel is similarly not dispositive. In *Mongomery Cnty.*, many officials within the county that had hired Shamos, the attorney in that case, "called Shamos a consultant," rather than a lawyer. *Montgomery Cnty.*, 175 F.3d at 299. And, he was referred to as a "consultant" in both a letter written by the county commissioner, and in an official county meeting. *Id.* Indeed, that the county had previously considered hiring non-legal consultants in the attorney's stead did not diminish Shamos' role as counsel. *Id.* at 303. The salient point was:

> Although the County explored retaining a consultant who was not a member of the bar, the County decided to retain Shamos, an attorney. Thereafter, the County sought, and Shamos performed, legal services, including negotiating a contract and rendering advice. Even if the County had not contemplated utilizing Shamos's legal acumen when it initially solicited his services, the County, notwithstanding some

---

[6] Federal Rule of Evidence 501 addressing claims of privilege governs both criminal and civil cases, and privilege decisions in the context of civil cases are thus instructive.

of its officials' occasional characterizations of Shamos as a consultant, ultimately had Shamos perform legal services for it.

*Id*. So too here. Whatever the government cooperators believed, the record reflects that Mr. Weinstein hired Erez as counsel, and that Erez performed transactional legal services. *See supra* § I; Exs. 1, 2.

Even assuming that some of Erez's communications were not for the purpose of providing legal consultation or services (which Mr. Weinstein disputes), that does not vitiate the entirety of the attorney-client privilege. To the contrary, when counsel plays two roles for a single client, one in the capacity of a lawyer and one as a non-legal advisor, the law requires ***careful scrutiny of each potentially privileged communication*** to ascertain whether ***each particular communication*** was for a the "predominant purpose" of rendering legal counsel or services. *See In re Cnty. of Erie*, 473 F.3d at 422 (analyzing the "predominant purpose" of a communication with counsel who held "dual legal and non-legal responsibilities"; ultimately "conclude[ing] that each of the ten disputed e-mails was sent for the predominant purpose of soliciting or rendering legal advice."); *accord In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1037-38 (determining following *in camera* review of potentially privileged documents that the communications protected by the attorney-client privilege: counsel provided transactional advice that also involved the client's business objectives, the "advice sought was legal rather than commercial in character" as the "documents memorialize client confidences obtained in the pursuit of legal advice concerning the mechanics and consequences of alternative business strategies. Such material is protected by the privilege."); *Travelers Prop. Cas. Co. of Am. v. USA Container Co.*, No. 09CV01612JLLMAH, 2012 WL 12898823, at *21 (D.N.J. Oct. 25, 2012) (judge "reviewed, *in camera*, each of the[ potentially privileged] documents carefully," and made individualized attorney-client privilege findings as to each of the documents).

Careful consideration of each presumptively privileged communication between Mr. Weinstein and Erez is similarly required. The filter team should thus produce to Mr. Weinstein all private communications he had with Erez for review. Thereafter, to the extent there are disagreements respecting the privileged nature of any particular document, the Court should direct the parties to raise those disputes *in camera* at a later stage.

IV. **BLANKET ASSERTIONS OF FRAUD CANNOT WHOLESALE VITIATE THE ATTORNEY-CLIENT PRIVILEGE; A PARTICULARIZED DOCUMENT-BY-DOCUMENT REVIEW IS REQUIRED FOR THE CRIME-FRAUD EXCEPTION**

The government seeks to pierce the attorney-client privilege based on broad allegations "that Weinstein and Erez worked together to commit fraud." Gov. Mot. at 15. But generalized allegations of fraud or criminality regarding an attorney-client relationship cannot negate the privilege in its totality. Application of the crime fraud exception requires a far more precise analysis to determine whether any specific communication was "in furtherance" of the alleged crimes. The government has not even attempted to do that here. Indeed, it cannot: the prosecution team litigating this issue is precluded from reviewing Mr. Weinstein's presumptively privileged documents, and Mr. Weinstein has yet to receive production of a single private communication of

Hon. Michael A. Shipp
April 9, 2024
Page 10 of 12

his with Erez. Once again, this litigation is plainly premature. It can only properly proceed once the government's filter team and defense counsel have reviewed the universe of presumptively privileged documents.

"The crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud." *Graco, Inc. v. PMC Glob., Inc.*, No. CIV.A. 08-1304 FLW, 2011 WL 666048, at *19 (D.N.J. Feb. 14, 2011). Instead, "the crime-fraud exception applies only where there is probable cause to believe that the ***particular communication with counsel*** or attorney work product ***was intended in some way to facilitate or conceal the criminal activity***." *Id.* (emphasis added); *accord In re Grand Jury Investigation*, 445 F.3d 266, 277 (3d Cir. 2006) ("This court's precedential opinions have repeatedly set forth the crime-fraud test as requiring that the communication have been 'in furtherance' of the crime," thus rejecting the "more relaxed" crime fraud test requiring that communications were only "related to" alleged crime); *accord United States v. Inigo*, 925 F.2d 641, 656–57 (3d Cir. 1991) ("when the legal consultation is in furtherance of a crime or fraud, the statements exchanged will not be protected").

The Third Circuit has established a clear process for determining whether the privilege can be pierced based on the crime-fraud exception. ***First***, "[t]o invoke the exception, the party seeking to overcome the privilege must . . . demonstrate a factual basis to support a good faith belief by a reasonable person that the seized materials may reveal evidence of a crime or fraud." *United States v. Scarfo*, 41 F.4th 136, 174–75 (3d Cir. 2022) (quotation marks, citations, and modifications omitted). ***Second***, "[i]f that threshold is crossed," the Court should undertake a particularized review of the documents sought by the prosecution team:

> [T]he district court will conduct an *in camera* review to determine whether the party advocating the exception has made a prima facie showing that (1) the client was committing or intending to commit a fraud or crime, . . . and (2) the attorney-client communications were in furtherance of that alleged crime or fraud.

*Id.* at 174–75 (quoting *In re Grand Jury Subpoena*, 223 F.3d at 217); *accord Graco*, No. CIV.A. 08-1304 FLW, 2011 WL 666048, at *19 ("The decision to engage in in camera review implicates a much more lenient standard of proof than the determination to apply the crime/fraud exception, as the intrusion on the asserted privilege is minimal. Before engaging in in camera review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.") (quotation marks and citations omitted).[7]

---

[7] Indeed, an *in camera* review to ascertain whether each document sought by the government is properly subject to the crime-fraud exception has long been standard practice. *See, e.g., In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1038 (engaging in a document specific review where the "the government" sought production of documents "because

  While the government makes sweeping proffers about the allegedly fraudulent nature of some of the transactions about which Mr. Weinstein ostensibly consulted with Erez, it has not come close to meeting the Third Circuit's more exacting standard to vitiate the privilege based on crime-fraud. Nor could it. Neither the government's prosecution team that filed the instant motion, nor Mr. Weinstein has seen the communications that the government seeks under the crime-fraud exception. None of the parties can presently intelligently address the Third Circuit's particularized requirement that the communications themselves were "in furtherance" of the crime. Of course, the government's prosecution team cannot legitimately review potentially privileged documents. But Mr. Weinstein and the government's filter team can, and should. Only review of the potentially privileged communication by both teams, and subsequent application to the Court for *in camera* review would be in accordance with the Third Circuit's established process.[8]

  Seeking to avoid the potentially laborious process of protecting Mr. Weinstein's privilege, the government requests bulk production of potentially privileged documents based on the Indictment's unproven allegations. The law requires much more. The Third Circuit has reversed decisions piercing the privilege based on precisely the kind of blanket ruling that the government requests. *See In re Grand Jury Proc.*, 604 F.2d 798, 800 (3d Cir. 1979) (vacating district court's order on the crime-fraud as insufficient to override privilege where district court "denied the use of the privilege" as to entire set of potentially privileged documents "because the government had presented *prima facie* evidence that a crime has been committed").

---

they reflect advice sought by AG in furtherance of an attempt to defraud the United States or to obstruct justice," and after *in camera* review of each specific document, "find[ing] some merit in the government's contentions as to certain of the documents."); *United States v. Trenk*, No. CIV. A. 06-1004 MLC, 2009 WL 485375, at *6 (D.N.J. Feb. 26, 2009) (conducting *in camera* review of documents sought under crime-fraud).

[8] That the government's prosecution team, rather than the filter team is litigation Mr. Weinstein's attorney-client privilege claims is itself an indication that the government is attempting to avoid the careful review process for presumptively privileged communications that the Third Circuit mandates. It also renders ineffective any effort by Mr. Weinstein or the Court to comply with the Third Circuit's requirements.

Hon. Michael A. Shipp
April 9, 2024
Page 12 of 12

---

Accordingly, the Court should deny the government's motion, and order the government's filter team to immediately produce to Mr. Weinstein all of his private communications with Erez for privilege review. Additionally, because the existence of the attorney-client privilege is a question of fact, to the extent necessary, the Court should hold a witness hearing to explore Mr. Weinstein's privilege claims.

Respectfully submitted,

/s/ IH

Henry E. Mazurek
Ilana Haramati

*Counsel for Defendant Eliyahu Weinstein*

cc:   Counsel of Record (*via Email*)