UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Michael A. Shipp, U.S.D.J. |
| | : | |
| v. | : | Crim. No. 24-128 (MAS) |
| | : | |
| ELIYAHU "ELI" WEINSTEIN, | : | **Reply in Support of Motion for** |
| a/k/a "Mike Konig," and | : | **Rejection of Attorney-Client** |
| ARYEH "ARI" BROMBERG | : | **Privilege Claims** |

## <u>INTRODUCTION</u>

Eliyahu "Eli" Weinstein ("Weinstein") and Aryeh Bromberg ("Bromberg") are attempting to hide behind their co-conspirator's law license with unsubstantiated assertions of privilege. Despite having worked closely with Shlomo Erez ("Erez") for over a year, they haven't described or identified a single confidential communication with him made for the purpose of giving or receiving legal advice. That's because Erez was not acting as a lawyer when Weinstein used him to hide assets and divert fraudulently obtained investor funds.

The Defendants do not come close to meeting their burden to establish privilege. After months of declining to assert any privilege by Optimus Investments Inc. ("Optimus") over communications with Erez, Bromberg has changed course, suddenly claiming a privilege in a conclusory half-page declaration. Bromberg circularly bolstered his threadbare allegation that he "believed Erez acted in his capacity as an attorney . . . and provided Optimus with legal advice on various deals and contracts" only by claiming that he paid Erez for legal advice. But regardless,

his assertion suffers from a more fundamental defect: Optimus cannot retain any privilege because its corporate status has been revoked by the State of New Jersey.

Weinstein's allegations of legal representation are nearly as generalized and must be viewed in light of his proven history of fraudulent misrepresentations, including to this Court. In addition, his claim of "joint representation" with Optimus fails to identify a single shared legal interest. What's more, Optimus' co-owner Joel Wittels ("Wittels") and Erez deny any legal representation whatsoever and Bromberg has conspicuously failed to corroborate it. Finally, even if Weinstein could meet his burden to establish privilege, the government can show that his entire involvement in the business transactions he says Erez advised him on was in furtherance of fraud and crime. At the time, Weinstein owed his victims over $200 million in restitution, was required to inform the Court of any material change in his circumstances, and was under a court order not to play any role, even an indirect one, in soliciting investor funds. And that's all before considering the facts of the new investment fraud scheme he operated through Erez and Optimus.

The government respectfully asks this Court to: (1) as soon as possible, find that Optimus' communications with Erez are not attorney-client privileged[1]; (2) as soon as possible, find that Weinstein cannot establish a joint representation privilege because Erez never represented Optimus and because Weinstein has made

---

[1] The government's motion was initially focused on Weinstein's individual privilege claim. However, now that Bromberg has asserted a privilege claim for Optimus and Weinstein has asserted a joint representation privilege claim, the government requests relief on each of these issues.

no more than a bare, conclusory assertion; (3) allow Weinstein no more than 30 days to create a privilege log before ruling on his individual representation claim; and (4) after that time, rule that Weinstein's communications with Erez are not privileged and/or subject to the crime-fraud exception.

## BACKGROUND

### A. Relevant Procedural History

#### 1. The Searches And Seizures

The government charged Weinstein, Bromberg, Wittels, Erez, and Alla Hattab ("Hattab") by criminal complaint on July 18, 2023. ECF No. 1. The following day, law enforcement executed search warrants on Weinstein's residence, Bromberg's residence, and Bromberg's and Optimus' office.[2]  Law enforcement also obtained separate search warrants to seize Weinstein's and Bromberg's cellular phones. Pursuant to those search warrants, law enforcement seized the following materials that are relevant to the instant motion:

> **Weinstein:** One Lenovo laptop computer, two iPad
> tablets, five flash drives, one Nokia cellular phone, one
> TCL cellular phone, one memory card, and documents.[3]

---

[2] Law enforcement also executed a consent search and a search warrant on a Florida residence associated with Weinstein. The documents seized from that residence are in the process of being produced to Weinstein.

[3] One additional electronic device, a memory card, was seized from Weinstein but will be returned to his counsel because it contains no data. The TCL cellular phone appears to contain no substantive data, so the filter team intends to turn it over to the prosecution team for production.

> **<u>Bromberg</u>:** One iPhone 14 cellular phone, one Mac
>
> Studio desktop computer, one Mac Time Capsule, one
>
> flash drive, and documents.[4]

These seized materials were then turned over to the Regional Computer Forensics

Laboratory ("RCFL"), which began a multi-month process to attempt to extract the

devices. These extraction attempts were only partially successful, as the RCFL was

unable to extract multiple of the electronic devices without passcodes for the

devices.

In advance of Weinstein's arrest, law enforcement learned that he used at

least two phones—one "clean" phone to speak with Probation and another personal

phone to conduct unsanctioned business activities with his co-conspirators. While

federal agents seized two phones from his residence, they were not able to seize his

personal phone through which Weinstein apparently conducted business activities.

On the day of the arrest, Weinstein was not at his residence and could not be

located for some time. When he finally surrendered to law enforcement, he did not

have possession of his personal phone. The government unsuccessfully attempted to

obtain Weinstein's personal phone from his then-attorney. Therefore, Weinstein

apparently retains sole access to his personal phone, which almost certainly

contains communications with Erez and other co-conspirators that are germane to

---

[4] Other electronic devices were seized from Bromberg, but the Government
intends to return them to his counsel because they were password-protected and
unable to be extracted. One additional device was seized from Bromberg, but he
claimed it was not his device and it contained no relevant data, so the government
is currently determining to whom the device should be returned.

the pending motion. Despite this, Weinstein has submitted zero materials from his personal phone in support of his position on the pending motion.

    2.  <u>Filter Team Efforts</u>

Throughout this case, the Defendants have repeatedly delayed the review and production of discovery.

    **a.  After Months Of Refusing To Take A Position, Bromberg Belatedly Asserted A Privilege.**

The filter team first contacted Bromberg's attorneys to negotiate filter terms on October 6, 2023. For almost three months, Bromberg's counsel failed to provide the filter team with a comprehensive set of privilege terms to run against Bromberg's devices, despite repeated requests. Finally, in early January 2024, Bromberg's counsel provided a full list of identifiers that were, pursuant to the proposed filter protocol that Bromberg's counsel ultimately signed, "designed to screen for privilege and attorney work-product." Tellingly, Bromberg did not identify Erez as one of the relevant attorneys. Out of an abundance of caution, over the ensuing month, the filter team asked specific follow-up questions about whether Bromberg or Optimus were claiming privilege over communications involving Erez, which Bromberg's attorneys only partially responded to. Bromberg made no assertion of privilege over Optimus' communications with Erez until he responded to the government's motion with a half-page, bare-bones declaration on April 9, 2024.

Bromberg claims in his response that the reason he waited until April 9, 2024 to assert a privilege on behalf of Optimus was because "there was still an ongoing

grand jury investigation." ECF No. 95 at 2. But this makes no sense. After all, Bromberg, as the holder of the privilege, should have known all along whether Optimus was asserting a privilege over communications with Erez. That he refused to assert a privilege for months is one reason to doubt his belated claims. What's more, Bromberg was charged on July 2023 in a 20-page complaint that meticulously laid out his role in the fraud and obstruction conspiracies, as well as Optimus' role in those offenses. Thus, his claims that a lack of notice of the charges against him prevented him from taking a position on privilege are simply not true.

### b. Weinstein Refused For Months To Meaningfully Engage With The Filter Team.

On December 7, 2023, the filter team reached out to Weinstein's counsel to request privilege search terms. The filter team reached out again on December 14, 2023. For more than a month, Weinstein's attorneys did not respond at all. Then, on a January 12, 2024 phone call, Weinstein's counsel suddenly asserted a privilege over communications with Erez on the ground that Erez was Weinstein's personal lawyer. In addition, Weinstein's attorneys stated that they did not represent Optimus and did not intend to assert privilege claims on behalf of Optimus, but to the extent that there were allegations that Weinstein was working for Optimus, they may assert privilege over some of Weinstein's communications on the ground of the entity's privilege. The filter team made multiple additional requests in January and February for more specifics on Weinstein's privilege claims, but Weinstein's counsel refused to elaborate. Indeed, Weinstein made no more detailed articulation

of his privilege claims until he responded to the government's motion on April 9, 2024. And even then, it was through only a conclusory, unsupported declaration.

Again out of an abundance of caution, after Weinstein and Bromberg opposed the instant motion, the filter team sought to enter into filter agreements containing Erez-related privilege terms with each of them. This was intended to serve two purposes: (1) allow the filter team to expedite the production of Erez-related materials to Weinstein and Bromberg; and (2) permit the prosecution team to receive all materials that did not hit on agreed-upon privilege terms, so they could conduct a responsiveness review and produce as discovery all of Weinstein's responsive materials to Bromberg and vice versa.[5] On April 18, 2024, Bromberg's counsel—who had previously executed the government's standard filter protocol with non-Erez-related privilege terms—agreed to an updated filter protocol with Erez-related terms. The filter team is currently working to apply the Erez-related terms (as well as other privilege terms agreed to by Bromberg and the filter team)

---

[5] There are two reasons why the government has not been able to produce the relevant non-privileged materials from Bromberg's devices to Weinstein, and the relevant non-privileged materials from Weinstein's devices to Bromberg. First, shortly after indictment, the prosecution team asked if Weinstein's and Bromberg's counsel would consent to the government turning over all of Weinstein's electronic device extractions to Bromberg, and vice versa. Bromberg's counsel explicitly refused to provide such consent, and Weinstein's counsel never responded. Second, Weinstein's and Bromberg's lengthy delay in engaging fully with the filter team, Weinstein's refusal until recently to sign a privilege protocol, and Bromberg's changing positions on asserting privilege over Erez communications have prevented the filter team from running privilege search terms and releasing to the prosecution team material that does not hit on those terms. The prosecution team, of course, cannot produce materials that are in filter because the materials are not in its possession.

to Bromberg's devices and documents, produce the results to Bromberg's counsel, and release the remainder to the prosecution team to review and produce in discovery.

On the other hand, Weinstein's counsel has not entered the government's standard filter protocol. Specifically, on April 19, 2024, Weinstein's attorneys sent a letter to the filter team stating that they "object to release of any materials to the prosecution team prior to completion of the filter review process," and would therefore refuse to enter the proposed agreement. The prosecution team understands that yesterday, Weinstein's attorneys indicated to the filter team that they are now willing to enter into a filter agreement. But if Weinstein does not follow through, the filter team will be forced to seek a court-ordered protocol, which—depending on the length of the resulting delay—could jeopardize the trial date currently set for November 12, 2024.

3.   Post-Search Productions To The Defendants

Despite the Defendants' efforts to cast the government as dilatory, the filter team has produced significant materials at their requests, and the prosecution team has produced substantial other discovery.

In late October 2023, Bromberg's counsel requested a copy of the extraction for Bromberg's cellular phone, which the filter team provided in mid-November 2023. Bromberg's counsel did not request the production of any other devices or documents seized from Bromberg or co-conspirators. Nevertheless, the filter team has since produced all the remaining relevant devices and documents seized from

Bromberg to his counsel. Notably, despite having his own cellular phone extraction since November 2023, Bromberg submitted zero materials in support of his position on the instant motion.

Until more than a month after the government filed the instant motion, Weinstein had never requested copies of any of the seized devices or documents. On April 5, 2024, his counsel sent a letter to the filter team, for the first time asking the filter team to collect all potentially privileged materials involving Erez, including from devices and documents seized from Weinstein,[6] and "to produce all of these materials to Mr. Weinstein for our immediate review." The filter team has since produced all relevant devices and documents seized from Weinstein to his counsel.

Aside from their own devices and documents, the Defendants have also received in discovery more than 400 consensual audio and video recordings, materials voluntarily produced to the government, subpoena responses, search warrant application materials, and email search warrant returns.

---

[6] Weinstein's counsel also demanded the production of communications between Erez and Weinstein from Erez's cellular phone. Setting aside that Weinstein has sole access to his own cellular phone—which presumably contains the same communications with Erez—the government is unable to produce anything from Erez's phone without entering filter protocols with Weinstein and Bromberg pertaining to those materials. The filter team expects to do so in short order.

## ARGUMENT

### A. Weinstein Has Not Met His Burden To Establish Privilege.

Weinstein's declaration alleging that he hired Erez in his personal capacity to advise him on business transactions is too little, too late. It is indisputable that the "party asserting a privilege bears the burden of proving the applicability of the privilege." *Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 126 (3d Cir. 1986); *see also United Sates v. Fluitt*, --- F.4th--, No. 22-30316, 2024 WL 1757482, at *5 (5th Cir. Apr. 24, 2024). And the assertion of privilege "demands a highly fact-specific analysis—one that most often requires the party seeking to validate a claim of privilege to do so document by document." *In re Grand Jury Subpoena (Mr. S.)*, 662 F.3d 65, 71 (1st Cir. 2011); *see also United States v. Rockwell Int'l*, 897 F.2d 1255, 1265 (3d Cir. 1990) ("[C]laims of attorney-client privilege must be asserted document by document, rather than as a single, blanket assertion."); *United States v. White*, 970 F.2d 328, 334 (7th Cir. 1992) (same).

That means that Weinstein must establish both the existence of an attorney-client relationship and that specific communications were made "for the purpose of obtaining or providing legal assistance." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (cleaned up). That definition excludes: (1) "conduit" information "transmitted to an attorney with the intent that the information will be transmitted to a third party," *White*, 970 F.2d at 334 (cleaned up); *In re Grand Jury Proc.*, 616 F.3d 1172, 1183 (10th Cir. 2010); (2) actions taken by an attorney to transfer funds, *Dist. Title v. Warren*, 265 F. Supp. 3d 17, 23 (D.D.C. 2017) ("[I]t would not invade the attorney client privilege to ask Mr. LeFande about his alleged

10

role in the transfer of funds to New Zealand and any actions he took or instructions he provided to third parties to that end."); *United States v. Spencer*, 700 F.3d 317, 320 (8th Cir. 2012); or (3) business advice, *Spencer*, 700 F.3d at 320; *see also Burton v. R.J. Reynolds Tobacco Co.*, 200 F.R.D. 661 (D. Kan. 2001). Finally, the proponent of a privilege must show that a communication was made in confidence. *See In re Teleglobe*, 493 F.3d at 359. The presence of, or later disclosure to, any third party vitiates the privilege. *Id.* at 361.

Weinstein does not come close to meeting this burden. He does not identify a single communication made for the purpose of obtaining or providing legal advice, despite having always had access to his personal phone with his communications with Erez and presumably any email account he may have used. Nor has he supported his allegation that he paid Erez a monthly legal retainer with any account statement or other documentary evidence. The general allegations of receiving legal advice contained in his declaration amount to nothing more than blanket assertions of representation and advice, which are wholly insufficient to establish privilege. Govt's Mot. at 11-12. For example, he alleges that he "regularly asked [Erez] to provide legal advice on sales and purchase agreements, to review correspondence and draft legal notices, and provide general business law advice," and to "advise on legal matters relating to the terms and conditions of business transactions," and that he "engaged Mr. Erez to perform legal due diligence for various business offers involving foreign assets and parties." None of these general claims come close to meeting his burden.

11

Nor does the mention of two matters—alleged requests for advice about the purchase of medical gowns in Israel and Turkey and whether to "engag[e] with" Saniton Plastic company, Weinstein Declaration at 1-2—come much closer to establishing privilege. Weinstein neither identifies nor describes any privileged communications or documents arising from these undated transactions. The First Circuit rejected a similar basis for a privilege claim, holding as insufficient allegations that:

> Doe is licensed to practice law and holds himself out as an attorney with special expertise in real estate transactions; Mr. S. sought Doe's legal services in connection with the real estate transaction identified in the subpoena; Doe represented him as his lawyer in that transaction and billed him for the related legal services; Doe 'used his client trust account' and 'signed documents and correspondence,' employing the descriptor 'Esquire.'

*In re Grand Jury Subpoena (Mr. S.)*, 662 F.3d at 71.

Finally, factual allegations in support of privilege claim "cannot be assessed in a vacuum but, rather, must be viewed in light of the government's opposition and the proffered documents." *Id.* Weinstein's nonexistent credibility must be considered. He has pled guilty to two major fraud offenses and committing an offense on pretrial release, and he is now facing charges for a third major fraud and obstruction scheme—all carried out while he was on supervised release. Weinstein also has a long history of submitting fraudulent, misleading, and unsupported claims to this Court and the Circuit, which has caused courts to repeatedly denounce his veracity. Here are some examples:

- "It's not only your lawyers that you lied to, it's not only me that you lied to and all those phony certifications, the phony affidavits that you have signed, you lied to your wife, you betrayed your children . . . ." Ex. A, Sentencing Transcript ("Sent. Tr.") in *United States v. Weinstein*, 11-CR-701, at 700:5-9;

- Judge Pisano noted that in Weinstein's plea agreement, Weinstein represented he would make a full accounting of where the money had gone, but never did so. *id.* at 692:10-18;

- "I find you to be a flight risk because you filed a false affidavit with this Court in asking for the appointment of counsel on June 2, 2013." *See* Ex. B, Motion Hearing Transcript in *United States v. Weinstein*, 11-CR-701, at 27:15-17;

- "What we have is simply a person who is fraudulent in his very essence. That's all he is, he is a fraud. He doesn't know anything else. Everything he tells people is fraudulent, it's a lie, it's bogus." Ex. C, Sentencing Transcript ("Sent. Tr. 2") in *United States v. Weinstein*, 14-CR-219, at 22:17-20;

- Weinstein "lies to people, even the people who are important to him." *id.* at 22:24-25;

- Weinstein's "very core nature compels [him] to lie and cheat and steal," *id.* at 31:14-15; and

- "Weinstein cites only unsubstantiated hearsay to support his claims. Initially this hearsay appeared only in his self-serving declaration, which was riddled with minor inaccuracies[.]" *United States v. Weinstein*, 658 F. App'x 57, 61 (3d Cir. 2016).

Weinstein has also previously been accused by this Court of using litigation as a delay tactic. *See United States v. Weinstein*, No. 11-CR-701 (JAP), 2014 WL 12703731, at *2 (D.N.J. Jan. 28, 2014), *aff'd*, 658 F. App'x 57 (3d Cir. 2016) (unpublished) (noting that "it appears to the Court that Weinstein used this last-minute Motion to substitute counsel as a delaying tactic"). And in one of his prior criminal cases, the Court also noted that he made "one specious challenge, one ridiculous argument after another." Sent. Tr. 2 at 27:7-9. Particularly given the complete lack of detail or corroboration for Weinstein's claims, they should be given little to no weight.

13

On the other hand, Erez—charged here with serious crimes but, unlike Weinstein, having no history of lying to this Court—has consistently denied ever representing Weinstein as an attorney or giving him legal advice. In a sworn declaration attached hereto as Exhibit D, Erez has denied every material allegation in Weinstein's April 9, 2024 declaration—including that Weinstein paid him a retainer for legal advice and that he provided legal advice on specific transactions. And unlike Weinstein's conclusory declaration, Erez's contains details and justifications that reinforce his credibility, including that he could not have provided legal advice to Weinstein or Optimus because under Israeli law he would have needed a power of attorney to do so; he has no relevant experience on international regulatory matters, import/export law, patent law, or other areas of alleged expertise listed in Weinstein's declaration; and that Weinstein and Bromberg used *actual* attorneys when they needed legal counsel, including on deals involving Erez. *See* Ex. D.

Weinstein argues that he has been unable to support his privilege assertion because the government had not produced the seized documents and files. That doesn't wash; as explained above, Weinstein has had sole access to a device—his "dirty" phone—he used to conduct business with Erez throughout their relationship, but he has submitted no materials from his phone in support of his position on this motion.

The Court should also deny Weinstein's alternative request for a hearing to "explore Mr. Weinstein's privilege claims." ECF No. 95 at 12. This request appears

14

to be nothing more than a fishing expedition for impeachment material of potential government witnesses, including Erez, before trial. Despite apparently working with Erez since 2021, Weinstein has offered nothing more than a conclusory and vague declaration bereft of any corroboration. And Weinstein now has access to all the devices and documents seized from him, even though he never requested them until after the government filed the instant motion and the government was under no obligation to produce them prior to the agreed-upon discovery deadline. *See* ECF No. 89.

Nevertheless, out of an abundance of caution, the government respectfully asks this Court to set a 30-day deadline for Weinstein to identify specific communications made for the purpose of giving or receiving legal advice as a last opportunity to establish privilege, and to produce a privilege log for those allegedly privileged communications that provides the information described in Federal Rule of Civil Procedure 26(b)(5)(A). *See United States v. Fluitt*, No. 22-30316, 2024 WL 1757482, at *5 (5th Cir. Apr. 24, 2024) (not precedential) (magistrate judge did not abuse her discretion in finding defendants' privilege logs inadequate because the logs "do not provide a description for the documents/emails to explain why each should be protected from disclosure"). The government believes a court-ordered deadline is necessary given Weinstein's past refusal to engage with the government's filter team or to give any further information about his privilege claim until after the government filed a motion.

**B.     Any Privilege Optimus Had Died With It, But Even If It Did Not, Bromberg Has Not Met His Burden to Establish It Existed.**

Bromberg's late-asserted privilege claim on behalf of Optimus holds even less water. Optimus' defunct, revoked status dissolves any attorney-client privileges it may once have had and Bromberg's bare, uncorroborated allegation of a representation relationship would not establish one regardless.

First, Bromberg and Weinstein can't hide behind Optimus' attorney-client privileges because the entity is defunct, as reflected in the New Jersey Division of Revenue & Enterprise Services' recent revocation of its corporate status for failing to file an annual statement for two years. *See* Ex. E. The weight of authority holds that "a defunct or dissolved corporation does not retain the protections of either the attorney-client privilege or the work product doctrine." *In re Am. Med. Collection Agency, Inc., Customer Data Sec. Breach Litig.*, No. 19-MD-2904 (MCA) (MAH), 2023 WL 8595741, at *5 (D.N.J. Oct. 16, 2023) (unpublished); *see also* S.*E.C. v. Carrillo Huettel LLP*, No. 13-CV-1735 (GBD), 2015 WL 1610282, at *2 (S.D.N.Y. Apr. 8, 2015) (unpublished) ("The weight of authority, however, holds that a dissolved or defunct corporation retains no privilege.") (collecting cases); *Gilliland v. Geramita*, 05-CV-1059, 2006 WL 2642525, at *4 (W.D. Pa. 2006) (unpublished) (the "better rule" is that "the attorney-client privilege is no longer viable after a corporate entity ceases to function, unless party seeking to establish privilege demonstrates authority and good cause"). This makes sense because "[w]hen the corporation is gone, so too is its interest in protecting its communications; the need to promote full and frank exchanges between an attorney and agents of his

16

corporate clients disappears when the corporation employing those clients has departed." *Trading Techs. Intern., Inc. v. GL Consultants, Inc.*, 05-CV-5164, 2012 WL 874322, at *4 (N.D. Ill. Mar. 14, 2012) (unpublished).

Second, even if Bromberg could assert privilege on behalf of a defunct corporation, his bare claim of representation would not meet his burden. *Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d at 126; *In re Grand Jury Subpoena (Mr. S.)*, 662 F.3d at 71; *White*, 970 F.2d at 33. Despite having had access to his personal cellular device since mid-November, and supposedly having retained Erez as Optimus' attorney in Fall 2022, Bromberg has neither identified nor described a single communication made for the purpose of obtaining or dispensing legal advice. His general and conclusory assertion, that he "believed Erez acted in his capacity as an attorney for Optimus and provided Optimus with legal advice on various deals and contracts," is supported with only one specific factual allegation: "Beginning in the Fall of 2022, I and Joel Wittels began paying Erez approximately $7,500 a month for his advice and counsel, as well as paying for travel expenses." Notably, Bromberg does not even aver that the money was for legal advice or counsel.

Moreover, Erez denies in his sworn declaration that he ever was retained to serve as an attorney for Optimus or provide it legal advice. Ex. D at ¶ 11. Unlike Bromberg, Erez's declaration includes information which supports his claim—namely, that Erez "had very few interactions with Aryeh Bromberg or with Optimus"; "[f]unds were wired from Optimus to [Erez's] accounts at the direction of

17

Mr. Weinstein, but [Erez] did not serve as Optimus' lawyer in any capacity"; and that Erez, who never received a power of attorney and was not qualified to represent Optimus in the United States, helped Bromberg to find legal representation in the United States. *Id.* at ¶¶ 8, 11. And, as explained in the government's opening brief, the denial by Optimus' co-owner Wittels of any attorney-client relationship with Optimus further services to undermine Bromberg's assertions and prevent his conclusory declaration from meeting Optimus' burden.

With so little to support his assertion of privilege on Optimus' behalf, Bromberg grasps at the government's proffer that conspiracy members sometimes held Erez out as Optimus' attorney to third parties. He claims that "the government has not explained why" Erez would have gone along with this "if Erez actually believed he was not acting as an attorney[.]" ECF No. 95 at 3. But the answer is plain from the government's motion: this was done to assuage investor fears, in furtherance of the charged fraud. Govt's Mot. at 9. This fact does not, as Bromberg suggests, *see* ECF No. 95 at 3, shift the burden to the government to disprove the existence of privilege.

As explained above, Bromberg has had access to his personal cellular device since mid-November. And although he never requested any of his other seized devices or documents and the government was not required to produce them until the agreed-upon discovery deadline, he now has access to all of his materials. Yet he has not identified any facts or communications further supporting his assertion of privilege.

### C.     Weinstein's Claim Of A Joint-Representation Privilege Is Meritless.

Weinstein's claim that he and Optimus were engaged in a joint representation relationship with Erez is unexplained,] uncorroborated, and unsubstantiated. Accordingly, this Court can reject it out of hand.

A joint representation relationship exists where two clients hire the same counsel to represent them on a matter of common interest.[7] *In re Teleglobe*, 493 F.3d at 362. "[C]lients of the same lawyer who share a common interest are not necessarily co-clients." *Id.* Instead, there must be a meeting of the minds; whether a joint representation exists "is determined by the understanding of the parties and the lawyer in light of the circumstances." *Id.* It cannot "somehow arise through the expectations of [one party] alone." *Id.* (cleaned up). The Third Circuit has cautioned courts to "be careful not to imply joint representations too readily." *Id.*; *see Hunton & Williams v. U.S. Dep't of Just.*, 590 F.3d 272, 285 (4th Cir. 2010) ("indicia of joint strategy" were insufficient to find an implied common interest agreement).

A joint representation "is limited by the extent of the legal matter of common interest." *In re Teleglobe*, 493 F.3d at 363 (cleaned up). Accordingly, parties "must show not only that [they] shared a common attorney, but also that they shared a common legal interest . . . pursuant to which they retained that common attorney."

---

[7] The joint representation privilege, where clients are represented by a single lawyer, is distinct from a common interest privilege, which exists when parties are represented by different attorneys and "only applies when those separate attorneys disclose information to one another, not when parties communicate directly." *In re Teleglobe*, 493 F.3d at 372.

*Sec. & Exch. Comm'n v. Rayat*, No. 21-CV-4777 (LJL), 2023 WL 4706074, at *3 (S.D.N.Y. July 24, 2023) (unpublished). They must make "a substantial showing . . . of the need for a common defense as opposed to the mere existence of a common problem." *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 434 (S.D.N.Y. 2013). And it goes without saying that defendants cannot conspire with each other to commit fraud and then claim that their communications in furtherance of that conspiracy are shielded by any joint representation that might otherwise exist.

In his declaration, Weinstein alleges that "I met and communicated with Mr. Erez in a joint representation capacity to discuss legal issues involving Optimus that also could impact me personally. I further understood that members of Optimus agreed to this common interest relationship." Weinstein Decl. at 2. That is the sum total of Weinstein's allegations on this issue. Weinstein does not identify a single legal issue in which he and Optimus shared a common interest. Moreover, he supplies no evidence that Optimus' managers also intended and expected to enter a joint representation relationship. Glaringly, Bromberg does not join in this assertion of a joint-representation privilege in response to the government's motion.[8] And as explained above, he cannot come close to establishing that Optimus had any protected communications with Erez at all. This alone is reason to reject the joint representation claim.

---

[8] The government understands that Weinstein's and Bromberg's criminal defense lawyers are now communicating pursuant to a joint defense agreement, which makes Bromberg's failure to echo Weinstein's claim even more striking.

This Court should reject Weinstein's claim of a joint representation relationship outright. The upshot of this finding would be that, even assuming Weinstein established an individual representation relationship, he could not assert a privilege over any communications with Erez made in the presence of Optimus employees, or vice versa. That's because "[d]isclosing a communication to a third party unquestionably waives the privilege." *Teleglobe*, 493 F.3d at 361.

### D. The Crime-Fraud Exception Applies.

The crime-fraud exception is just that: an exception. It applies once the party supporting a privilege has established that communications were made in confidence to his attorney for the purpose of obtaining or providing legal assistance. *See United States v. Zolin*, 491 U.S. 554, 563 (1989); *In re Grand Jury Subpoena (Mr. S.)*, 662 F.3d 65, 69 ("First, it is not necessary to resort to the crime-fraud exception to the attorney-client privilege, until the privilege itself has been attached. The burden of showing that documents are privileged rests with the party asserting the privilege."). Because neither Weinstein nor Optimus has established that the privilege applies, this Court need not reach the question of the crime-fraud exception. But even if the Court were to find that the Defendants had met their burden of showing that there were privileged communications between Erez and the Defendants (they have not), any communications relevant to this case are subject to the crime-fraud exception given the nature of Weinstein's frauds.

### 1. The Government Can Rely On An Indictment To Make a Prima Facie Case That The Crime Fraud Exception Applies.

To pierce the privilege here, assuming for the sake of argument that there was one, the government must show "a reasonable basis to suspect that" (1) Weinstein and Optimus committed or intended to commit a crime or fraud, and (2) their communications with Erez were in furtherance of that crime or fraud. *In re Grand Jury (ABC Corp.)*, 705 F.3d 133, 153-54 (3d Cir. 2012). This is not a heavy lift; a reasonable basis is a lower quantum of proof than more likely than not. *Id.* And as explained in the government's opening brief, the reasonable basis standard can be satisfied by an indictment, which issues upon a finding of probable cause, *Kaley v. United States*, 571 U.S. 320, 327 (2014), meaning "a reasonable ground for belief of guilt," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). An indictment shows that "the grand jury has already been satisfied by a showing of evidence that establishes the elements of criminal or fraudulent activity. This demonstration of criminal activity should end the matter." *United States v. Stein*, 21-CR-20321, 2023 WL 2585033, at *4 (S.D. Fla. Mar. 21, 2023) (unpublished).

Optimus claims that the First Circuit's decision in *United States v. Gorski*, 807 F.3d 451, 461 (1st Cir. 2015), holding that an indictment satisfies the reasonable basis test, represents a circuit split with the Third. ECF No. 95 at 4. But the requirement that the government make a "presentation of evidence" in a case at the grand jury stage, *In re Grand Jury Investigation*, 445 F.3d 266, 274 (3d Cir. 2006) (cleaned up), is hardly inconsistent with reliance on a grand jury's findings, which are necessarily based on evidence. Regardless, the government has more

22

here, including the "the sworn Complaint which preceded the Indictment[, which] recites concrete evidence that compellingly reinforces the existence of probable cause." *United States v. Spinosa*, No. 21-CR-206 (PAE), 2021 WL 2644936, at *6 (S.D.N.Y. June 28, 2021) (unpublished). Furthermore, four defendants have now pled guilty to conspiring with Erez, Bromberg, Weinstein, and others to commit securities fraud by defrauding Optimus and Tryon investors.[9]

In most criminal cases, the indictment will be sufficient to establish that the defendant committed a crime but not necessarily to show that communications with an attorney were in furtherance of the crime. *See, e.g., Spinosa*, 2021 WL 2644936, at *6. But this is a case in which "there is a reasonable basis to suspect that [the parties'] entire act of retaining counsel and soliciting legal advice was in furtherance of his alleged crime or fraud." *United States v. Hallinan*, 290 F. Supp. 3d 355, 367 (E.D. Pa. 2017), *aff'd sub nom. United States v. Neff*, 787 F. App'x 81 (3d Cir. 2019).

Weinstein's entire involvement in the business transactions forming the basis of his privilege claims was in furtherance of fraud and crime. After his sentence was commuted in February 2021, the Court entered an order prohibiting Weinstein

---

[9] *See United States v. Anderson*, 23-CR-684 (MAS) (pled guilty on August 30, 2023 to conspiracy to commit securities fraud); *United States v. Curry*, 23-CR-689 (MAS) (pled guilty on August 30, 2023 to conspiracy to commit securities fraud); *United States v. Alaa Hattab*, 23-CR-866 (MAS) (pled guilty on November 2, 2023 to conspiracy to commit securities fraud); *United States v. Joel Wittels*, 24-CR-210 (MAS) (pled guilty on March 27, 2024 to conspiracy to commit securities fraud, conspiracy to obstruct justice, and conspiracy to commit to engage in the unlicensed wholesale distribution of prescription drugs).

from, among other things, liquidating assets and playing a role, directly or indirectly, in soliciting money from investors. *See* ECF No. 85 at 23, ¶ 2a. Moreover, the restitution judgments from his prior convictions remained in place. Under them, Weinstein owed his victims $228 million in restitution, and he had to notify the Court of any material change in his economic circumstance. *Id.* at 25, ¶ 5c. As alleged in the Indictment, Weinstein used Optimus, which Weinstein ran in the shadows, to raise money for transactions from investors. *Id.* at 24, ¶ 5a. Thus, any communications between Erez and Weinstein concerning the transactions he describes in his affidavit would by necessity be in furtherance of the obstruction conspiracy charged in the Indictment and evidence of his crimes.

Weinstein's participation in deals with Optimus was likewise fraudulent. He hid his identity and involvement to mislead investors. ECF No. 85 at 3-4, ¶¶ 4a-c. Weinstein and Bromberg both admitted this in a surreptitiously recorded meeting on August 31, 2022, which Erez attended:

> WEINSTEIN:    There's another problem. We collectively did not tell everyone who I was, no one would ever give you a penny if they knew who I was . . . because I have a bad reputation.
>
> BROMBERG:        Correct.

*Id.* at 15, ¶ 5g; *see also* Complaint, ECF 1 at ¶ 42. Thus, Optimus itself was founded on a fraud. Any communications Erez had with Weinstein about Optimus would be in furtherance of the fraud on Optimus and Tryon investors, which was, of course, predicated on the deception and material omission of Weinstein's involvement in the company.

The Indictment further details how the purported deals Weinstein, Bromberg, and others used to raise money from Optimus and Tryon investors were fraudulent, because either they did not exist or Weinstein misappropriated the funds from investors for other purposes. ECF No. 85 at 10-14. The sworn complaint details how Erez was essential to this scheme because Weinstein used Erez to divert at least $12 million of investor money from the Optimus bank accounts for Weinstein's benefit, and for purposes other than what investors were promised, including millions of dollars toward a luxury penthouse apartment in Miami and millions more toward a purported land deal in Morocco. *See* ECF 1 at ¶¶ 48, 64. Weinstein himself admitted in recorded meetings in August 2022, some of which Erez attended and participated in, that many of the Optimus deals were fraudulent and Weinstein misappropriated investor money and lied about it. *See id.* at ¶ 4aa, ee, ff. Weinstein made this plain to Erez in an August 31, 2022 meeting with his co-conspirators, stating, "I finagled, and Ponzied, and lied to people to cover us." *Id.* ¶ 3. Indeed, the only specific transaction Weinstein references in his declaration is purported legal advice Erez gave to him regarding the "Saniton Plastic company." ECF No. 96-1. But the Indictment explains how Weinstein (aided by his co-conspirators) was a silent partner in Saniton Plastic and, with his co-conspirators, used it to divert investor money and hide his business activities from the government and his past victims. ECF No. 85 at 13-14. Thus, here too, any communications between Erez and Weinstein related to Saniton Plastic would be in furtherance of his crimes.

### 2. Defendants' Bare Assertions Of Privilege Do Not Entitle Them To A Communication-By-Communication Evaluation.

Contrary to Defendants' arguments, the law does not require a communication-by-communication evaluation under the circumstances here, where not only did fraud drive the entire use of Erez's services—even accepting Weinstein's incredible characterization of them—but Weinstein also failed to identify any protected communications in the first place. In most cases, including those that Defendants have cited, the proponent of the privilege has already established that it exists by listing specific privileged communications. And "[b]ecause it is often difficult or impossible to prove that the exception applies without delving into the communications themselves . . . courts may use *in camera* review to establish [its] applicability." *In re Grand Jury Subpoena*, 745 F.3d 681, 687 (3d Cir. 2014). But far from creating a *per se* rule that a court must always conduct an *in camera* inspection of documents, the Third Circuit has taken pains "not [to] suggest that *in camera* review is necessary in every case in which the crime-fraud exception is invoked, as a party may be able to satisfy both elements of the crime-fraud exception without resort to the privileged documents themselves." *In re Chevron Corp.*, 633 F.3d 153, 167 n.19 (3d Cir. 2011).

But again, this question is academic here, where the privilege proponents have failed to describe any protected communications or documents. *Cf. In re Grand Jury Proc.*, 802 F.3d 57, 68 (1st Cir. 2015) ("The failure to produce a privilege log (or otherwise identify particular documents subject to the privilege) to support the need for *in camera* inspection waived appellant's right to seek *in camera* inspection.").

Based on the blanket, unsubstantiated claims of privilege that Defendants have advanced so far, as well as the way that Weinstein's fraud and obstruction crimes permeated all his transactions, a more generalized finding is appropriate.

## CONCLUSION

For these reasons and the reasons outlined in its opening brief, the government respectfully asks this Court to: (1) as soon as possible, find that Optimus' communications with Erez are not attorney-client privileged; (2) as soon as possible, find that Weinstein cannot establish a joint representation privilege because Erez never represented Optimus and because Weinstein has made no more than a bare, conclusory assertion; (3) allow Weinstein no more than 30 days to create a privilege log before ruling on his individual representation claim; and (4) after that time, rule that Weinstein's communications with Erez are not privileged and/or subject to the crime-fraud exception.

Respectfully submitted,

PHILIP R. SELLINGER
UNITED STATES ATTORNEY

By:    *s/ Jonathan Fayer*
       Jane Dattilo
       Carolyn Silane
       Mark J. Pesce
       Jonathan Fayer
       Assistant U.S. Attorneys